# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL D. JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:13-cv-00737-AKK** |
| **CITY OF HOMEWOOD,** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Michael D. Jackson pursues claims against the City of Homewood ("the City") for failure to accommodate and discrimination under the Americans with Disabilities Act ("ADA"), age discrimination under the Age Discrimination in Employment Act ("ADEA"), and retaliation under the ADA and ADEA. *See* doc. 29. Jackson contends that the City failed to make reasonable accommodations to account for his hypertension and degenerative joint disease in his knee, discharged him because of his age and disabilities, and retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See id*. The City moves for summary judgment on all of Jackson's claims, doc. 59, and the motion is fully briefed and ripe for review, docs. 74; 77. The parties have also moved to strike portions of their respective evidentiary

materials, docs. 68; 69; 70; 71; 72; 73; 78; 79; 80; 81; 88. After carefully reviewing the evidentiary submissions and the briefs, the court finds that there are no material factual disputes, and the City's motion is due to be granted.

## I. MOTIONS TO STRIKE

Before addressing the summary judgment motion, the court will first address the parties' motions to strike. Jackson contends, for various reasons, that the court should strike several affidavits and documents submitted by the City. [1] *See* docs. 68–73. However, most of the issues Jackson raises are not proper for a motion to strike. For instance, in Jackson's second motion to strike, he objects to Homewood Mayor Scott McBrayer's statement that the City discharged Jackson for "certain rules and regulations" because Mayor McBrayer did not "cite[] the rules he is talking about," doc. 69 at 1, and in Jackson's third motion to strike, he objects to Homewood Chief of Police Jim Roberson's reference to Jackson's disciplinary hearing because the City failed to attach a record of the hearing to the affidavit, doc. 70 at 2. In fact, Jackson's contentions mostly challenge the sufficiency and probative weight of the City's evidence regarding its legitimate, nondiscriminatory justification for Jackson's termination. *See*, *e.g.* doc. 69 at 1 (arguing that the court should strike Mayor McBrayer's statement that he terminated Jackson based on

---

[1] Because the court does not rely on the affidavits of Blake Chaney, Hannah White, or Waleed Khalidi, the court finds that Jackson's sixth motion to strike, doc. 73, is **MOOT**.

"violation of certain rules and regulations" because "the employer must produce admissible evidence indicating that it …based its employment decision on a reasonably specific, legitimate reason . . ."). These contentions are not proper grounds for a motion to strike.

Jackson also challenges some documents on authenticity grounds. *See* doc. 72. However, "the Federal Rules of Civil Procedure does not require that 'evidence' submitted in support of summary judgment be sworn affidavits or documents authenticated by sworn testimony, but instead provides that '[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Moore v. J & M Tank Lines, Inc.,* No. CV-11-BE-01000-S, 2012 WL 3773626, *7 (N.D. Ala. Aug. 27, 2012) (citing Fed. R. Civ. P. 56(c)(2)). Similarly, although Jackson contends that several exhibits contain hearsay statements, docs. 69–71, the court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (citations and internal quotation marks omitted). Finally, although Jackson contends that Mayor McBrayer, Chief Roberson, and Sgt. Andrew Didcoct do not have first-hand knowledge about the circumstances surrounding the incident between Jackson and Jackson's accuser, *see* docs. 69, 70, 71, after carefully reviewing the evidentiary

record, the court finds that these individuals are competent to testify about an internal HPD investigation, and the discharge of a city employee. For these reasons, Jackson's motions to strike are **DENIED**.

With respect to the City's four motions to strike, *see* docs. 78, 79, 80, 81, the evidence that the City challenges in its second, third, and fourth motions does not raise disputes of material fact. Therefore, those motions are **MOOT**. The City's first motion to strike, doc. 78, challenges a declaration by Jackson that purportedly raises a dispute of material fact. *See* doc. 74-1 at 2–6. Specifically, the City contends that Jackson's claim that he "asked Chief Roberson and Deputy Chief Copus if they received a copy of [his] EEOC charge [and] they denied it[,]" directly contradicts his deposition testimony that he has no facts proving that the City had any knowledge of his EEOC charges. *Compare id.*at 5 *with* doc. 61-2 at 123. "When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984); *see also Santhuff v. Seitz*, 385 Fed. App'x 939, 944–45 (11th Cir. 2010) (the district court properly disregarded a third party affidavit that contradicted plaintiff's earlier deposition testimony that he had no evidence that defendant entered his property to steal his pet turtles). Although

4

Jackson offered no explanation for these directly contradictory statements, because Jackson's contention that he asked Chief Roberson and Deputy Copus about the EEOC charge does not impact the court's analysis of his retaliation claim, *see infra* at 28–29,  the City's first motion to strike, doc. 78, is **MOOT**. *See Lane v. Celotex Corp.*, 782 F.2d 1526 (11th Cir. 1986). Likewise, because the remainder of the City's first motion to strike challenges evidence that does not raise disputes of material fact, those objections are also **MOOT**.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear a burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## III. Factual Allegations

6

Jackson, who was 46 years old when the City terminated his employment, joined the Homewood Police Department ("HPD") in 1997. Docs. 32-2 at 3; 61-1 at 11, 25. Relevant to his disability claims, Jackson suffered from various impairments during his employment. For example, in 2011, Jackson drove to a hospital after experiencing chest pain, doc. 74-1 at 2, and between 2011 and 2012, Jackson's co-workers administered blood pressure tests to him at work on several occasions, *id*. Jackson also experienced knee pain as a result of a prior arthroscopic surgery, *see id.*; docs. 61-22 at 2; 74-5 at 11; however, he described the pain as minor to Dr. Bruce Romeo, and represented that it only occurred during rehabilitation exercises. Doc. 74-5 at 11. Notwithstanding these health problems, Jackson consistently passed his annual "fit for duty" examination, *see* doc. 61-22 at 1, and never portrayed himself as disabled. In fact, a month before his discharge, Jackson informed Dr. Romeo that he did not suffer from any health condition that would interfere with his ability to carry out the duties of a HPD officer. Doc. 74-5 at 9. Likewise, even after his termination, Jackson filed an application for unemployment compensation benefits with the Alabama Department of Labor, in which he represented that he wanted to work again as a full-time police officer, and did not consider himself disabled. Doc. 61-21 at 2–3. Indeed, Jackson obtained employment as a full time police officer for the city of Riverside, Alabama three months after his discharge. Doc. 61-1 at 24.

The events leading to Jackson's discharge began in June of 2012, when he met Blake Chaney, an 18 year old female college student, at the Purple Onion restaurant in Homewood, Alabama, where she would "hang out" with other police officers. Docs. 61-1 at 11, 54; 74-1 at 1–2. Jackson and Chaney eventually connected through social media and, sometime later, Jackson obtained Chaney's mobile phone number. Doc. 61-1 at 56. On the evening of August 6 and early morning of August 7, 2012, Jackson and Chaney had the following exchange via text message:

> [Jackson]: Hey, you ladies coming to the onion tonight?
>
> [Chaney]: I gotta 12 O'clock curfew tonight!
>
> [Jackson]: What did you do? Lol
>
> [Chaney]: Haha last week at home and I got a lot of [things] to do so she just wants me to get a good night of sleep
>
> [Jackson]: OK, I saw where it was Kylie's bday. Tell her I said happy birthday. I saw your[] pics on [Facebook]. You two are gorgeous! Very attractive.
>
> [Chaney]: We're not friends anymore . . . hahaha. But I'll tell her. And thank you!
>
> [Jackson]: Why not? What happened?
>
> [Chaney]: She doesn't like me hanging out with other people []
>
> [Jackson]: On your [Facebook] page [it] says your in a relationship with her, were you two a couple?
>
> [Chaney]: Haha no she did that
>
> [Jackson]: Ok, just wondering. lol you are very attractive but the best word I could come up with to describe u is very sexy.

[Jackson]: I bet you have a lot of guys asking u out?

Doc. 61-3 at 2–5. Chaney did not respond to Jackson's final two text messages. *Id.*

Sometime after this exchange, Jackson saw Chaney's automobile during his patrol near the Edgewood neighborhood of Homewood. As a result, Jackson initiated what he called a "good old boy" traffic stop, which Jackson described as involving the officer giving the offending driver an un-official warning. Doc. 61-1 at 65–66, 69, 72. Perhaps because of the unofficial nature of the traffic stop, Jackson failed to follow HPD protocol, which included keeping his emergency lights operational, informing dispatch about the stop, obtaining the driver's license and insurance information and checking for outstanding warrants, radioing dispatch at the conclusion of the stop, and recording the stop on the mobile video recorder ("MVR"). *Id.* at 45, 72–79.

A week after the stop, a fellow officer informed Jackson that other officers had encouraged Chaney to file a complaint against Jackson. Doc. 59-1 at 5. Consequently, Jackson sent Chaney the following text messages:

[Jackson]: Hey, its mike with the pd, I need to talk to you soon but not at the onion. Maybe u can call me tonight after 1030?

[Chaney]: About what?

[Jackson]: When I stopped u last week, somebody is trying to start something, its ok I just need to talk to ya. Can u call me in 5 min?

Doc. 61-3 at 5–6. Chaney subsequently called Jackson and the two talked for 11 minutes. *Id.* at 7. Three days later, despite Jackson's attempts to dissuade her, Chaney filed a complaint, alleging that Jackson sent her text messages that made her feel "uncomfortable and scared[,]" and asserting that Jackson pulled her over "for no reason (just to talk). And recently he texted me to call him, [and] when I did, he spent 11 minutes begging me to back him up." Doc. 61-8.

After receiving Chaney's complaint, Sgt. Didcoct, a member of HPD's internal affairs division, initiated an investigation, doc. 61-11 at 2–3, in which he interviewed Chaney, photographed Chaney's vehicle, watched MVR video of the traffic stop, examined the text messages between Jackson and Chaney, and reviewed Jackson's daily reports, *id.* at 3. Although Sgt. Didcoct did not interview Jackson, he directed Jackson to submit a written statement, which Jackson failed to do. Docs. 61-11 at 3. Based on the MVR footage, Sgt. Didcoct learned that Chaney's headlights and fog lights were operational,[2] docs. 61-9; 61-25, that unlike normal circumstances when the MVR recorded the entire traffic stop, doc. 61-11, Jackson's MVR video ended abruptly as Jackson exited the vehicle, doc. 61-25; *see* doc. 61-11. Moreover, immediately before the video ended, Sgt. Didcoct heard an audible beeping sound, which indicated that someone manually terminated the

_____

[2] Specifically, video evidence indicates that Chaney's front left headlight and fog lights were operational at the 14 second mark, and that the front right headlight and fog lights were operational at the 39 second mark. Doc. 61-25.

recording. Docs. 61-11 at 3; 61-25. In his deposition, Jackson blamed the recording issue on a malfunction of his MVR device and/or due to the DVD being full. Doc. 61-1 at 66. However, Sgt. Didcoct found no problem with the MVR system and noted that Jackson consistently reported that his vehicle and MVR were in full working order. *See, e.g.* doc. 61-11 at 3.

After the investigation, Sgt. Didcoct reported his findings to Chief Roberson. Doc. 61-11 at 2. In early September, Jackson received notice from the City that it intended to charge him with conduct unbecoming a classified employee, acting in a manner "as to bring discredit upon himself or the Police Department," and violations of HPD's MVR rules. Doc. 61-12. Pursuant to the notice, Jackson received a hearing on September 18, 2012, which he attended with his attorney and responded to the charges. Docs. 61-10 at 3; 61-11 at 2. As a result of the investigation and hearing, and after reviewing Jackson's disciplinary history, Chief Roberson recommended that Mayor McBrayer discharge Jackson. Doc. 61-10. Mayor McBrayer accepted the recommendation. Docs. 61-10; 61-11 at 2; 61-18.

After receiving notice of HPD's intent to bring charges against him, Jackson filed a charge of discrimination with the EEOC on September 12, 2015, claiming that Sgt. Didcoct's investigation was pretext for age discrimination because Jackson was the "second oldest patrolman in the department," that the HPD denied him a promotion to "motor scout" in 2011, and rumors about "getting rid of older

11

patrol officers and replacing them with younger patrol officers." Doc. 32-1 at 2. On the day of his discharge, Jackson and his attorney amended the EEOC charge to add disability claims based on "a heart condition, including high blood pressure." Doc. 32-2 at 3. Thereafter, Jackson amended his EEOC charge again to include a claim that the City retaliated against him for filing his age discrimination charge. Doc. 32-3 at 2.

### III. Analysis

The City challenges Jackson's claims on multiple grounds, which the court will address below. In Section A, the court will address the City's contention that Jackson failed to exhaust administrative remedies for his knee-based disability claims. In section B, the court will address the age and disability discrimination claims and, in section C, whether Jackson failed to establish that the City's reasons for his discharge are pretextual. Finally, the retaliation claim in Section D.

### A. Jackson Failed to Establish that he is Disabled

To establish his disability claims, Jackson must show that "(1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Davis v. Fla. Power and Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). Unfortunately for Jackson, his ADA claims,

which are based on knee and cardiovascular impairments, *see* doc. 29 at 7–10, suffer from many flaws.

### 1. Jackson Failed to Exhaust his Administrative Remedies in Regards to his Knee-Based Discrimination Claims

Before addressing whether Jackson is even disabled, the court must first consider whether Jackson is entitled to go forward with one of his disability claims. Relevant here, although Jackson's ADA claims are based on his knee and cardiovascular conditions, the only disabling condition he mentions in his EEOC charges is cardiovascular related. Docs. 32-1; 32-2; 32-3. Therefore, the threshold question is whether Jackson exhausted his administrative remedies with respect to his knee-based claims. The court must resolve this issue because a plaintiff asserting claims for discrimination must first exhaust his administrative remedies by filing an EEOC charge. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citing 42 U.S.C. § 2000 3–5(b)). Moreover, "[a] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can be reasonably expected to grow out of the charge of discrimination." *Gregory v. Dept. of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotation marks omitted). The central question regarding the scope of the charge of discrimination is "whether [Jackson's] complaint was like or related to, or grew out of, the allegations in the EEOC charge." *Id.* at 1280.

Relying on *Gregory* and *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970), Jackson maintains that the court should not strictly construe the scope of his charge, and that his purported knee condition is within the scope of the initial EEOC investigation because "'[c]ourts are extremely reluctant to allow procedural technicalities to bar claims brought under the Act.'" Doc. 74 at 17–18 (quoting *Sanchez* 431 F.2d at 466). Contrary to Jackson's contention, the issues here are more than "procedural technicalities." In fact, the *Sanchez* and *Gregory* cases are distinguishable because both involve plaintiffs who neglected to mark a form check-box indicating the legal basis of their discrimination claims, but included facts that would have reasonably indicated alternative legal theories. *See Gregory*, 355 F.3d at 1280; *Sanchez*, 431 F.2d at 462–63. Also, the plaintiffs in *Gregory* and *Sanchez* filed their charges without the assistance of counsel. *Id.* In contrast, Jackson had a full and fair opportunity, with the assistance of his attorney, to state the general factual basis for his disability claims at the EEOC stage, and, in fact, specifically amended his charge of age discrimination to include disability claims based solely on his "heart condition including high blood pressure." *See* doc. 32-2 at 2. Put simply, Jackson's failure to indicate in his charge that he purportedly has a knee-based disability is not a mere procedural error. Instead, Jackson failed to include substantive facts about a distinct disability that the City allegedly failed to accommodate, and which allegedly led to his discharge.

14

Moreover, the court cannot find that Jackson's knee-based claim "gr[e]w out of" his cardiovascular issues or consider the knee ailment "like or related" to the heart condition. After all, the two conditions exhibit different symptoms as a result of distinct environmental triggers, would hinder Jackson differently, and might require different types of accommodation. Indeed, Jackson cites different evidence in his brief in support of each condition. *Compare* doc. 71-5 at 13–14 (record from Dr. Bruce Romeo–created almost six months after Jackson's was discharged— stating that Jackson's knee would cause difficulty running) *with* docs. 71-1 at 2; 71-7 (a 2011 episode where Jackson was transported to a hospital for chest pain, and sometimes required on-the-job blood pressure checks). Accordingly, Jackson's disability claims that are based on a purported knee disability fail as a matter of law.

### 2. Jackson has Failed to Establish that his Heart Condition Significantly Limited a Major Life Function

The City also contends that Jackson's hypertension-based ADA claims fail at the prima facie case level. Doc. 59 at 4–5. Because Jackson's claims rely on circumstantial evidence, he bears the initial burden of establishing a prima facie case. [3] *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 2004). A

---

[3] Jackson cites numerous derogatory statements concerning his age and heart condition in support of his claims. However, "stray remarks [and] statements by nondecisionmakers" are not direct evidence that the City discharged Jackson based on discriminatory animus. *Standifer v. Sonic-Williams Motors, LLC.*, 410 F. Supp.

"disability" includes: "(A) a physical or mental impairment that substantially limits one or more of [Jackson's] major life activities . . . ; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see also Harris v. H and W Contracting Co.*, 102 F.3d 516, 518–20 (11th Cir. 1996). Accordingly, "[m]erely having a physical impairment is insufficient to be covered by the ADA." *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1357–58 (S.D. Fla. 1999). Rather, to prevail, Jackson must show that the "impairment substantially limit[s] [a] major life activity." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1999). "In determining whether a disability qualifies as a substantial limitation of a major life activity, courts are to consider '(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; (3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment.'" *Schwertfager*, 42 F. Supp. 2d at 1359 (citing *Gordon v. E.L. Hamm and Assoc., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996)).

Jackson maintains that his heart condition "substantially limits the major life function of his circulatory system" by "impair[ing] his ability to run or walk for long distances while working for Defendant." Doc. 74 at 19–20. In support of his

2d 1205, 1216 (N.D. Ala. 2005) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)); *see also EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990).

contention, Jackson cites an incident in 2011 that resulted in his admission to a hospital for chest pains, episodes at work requiring his co-workers to check his blood pressure, and a medical record from an exam that occurred five months after his termination that actually references Jackson's knee rather than his hypertension. *See* docs. 74-1 at 3–4; 74-5 at 12–13. None of these incidents, however, and nothing in the record, supports Jackson's contention that his hypertension impaired one of his major life functions. To the contrary, the record indicates that the condition had a minimal impact on Jackson's ability to perform his duties as a police officer. Among other things, Jackson (1) raced in a "Motocross series" in 2012, doc. 61-26, (2) expressed interest in working as a motorcycle patrol officer, *id.*, (3) has fit-for-duty examination records which indicate that he could perform the essential functions of his job without any restrictions, doc. 61-22 at 1, (4) self-reported in 2012 that he did not have any problems that would interfere with his ability to do his job, doc. 74-5 at 9, and (5) reported to the Alabama Department of Labor immediately after his discharge that he did not have a disability and could, in fact, work full time as a police officer, doc. 61-21 at 2–3. Indeed, Jackson subsequently obtained full time employment as a Riverside, Alabama police officer. Doc. 61-1 at 24. These are hardly activities or conduct that evidence a disability.

Notwithstanding this evidence, Jackson contends that his heart condition

qualifies as an ADA disability, in part, because a cardiologist prescribed Lisinopril,

and Dr. Romeo stated, in 2013, that Jackson would have difficulty running. *See*

doc. 74 at 17. This contention is unavailing because the Lisinopril prescription

alone does not establish that Jackson's hypertension impacted one of his major life

activities. *See, e.g. Schwertfager*, 42 F. Supp. 2d at 1357–58. Moreover, Dr.

Romeo's 2013 observation about Jackson's ability to run is based on the knee

ailment,[4] and was made almost six months after Jackson's discharge. Doc. 74-5 at

12–13. In other words, while the evidence indicates that Jackson suffered health

---

[4] Even if Jackson's knee-based claims are proper grounds for his discrimination
claim, Jackson has failed to establish that this ailment substantially limited one of
his major life activities. In fact, the only evidence Jackson cites in support of this
claim is his own declaration that he worked "in pain during most of my last few
years of employment," and a notation from Dr. Romeo stating that Jackson would
have difficulty running. *See* doc. 74 at 3 (citing docs. 74-1; 74-5 at 12–13)). The
declaration does not create a material dispute because, based on the medical
evidence, Jackson reported to Dr. Romeo in 2011 that his knee only hurt during
physical therapy and "after that no pain at all." Doc. 74-5 at 11. In fact, in August
of 2012, Jackson told Dr. Romeo that he had no problems that would interfere with
his ability to work, and that he had no undisclosed health problems. Doc. 61-22 at
3. Finally, over the course of his last few years of employment, Jackson
consistently passed fit-for-duty exams. *Id.* at 6 – 14. Moreover, Dr. Romeo's
observation about Jackson's difficulty running occurred almost six months after
Jackson's discharge. Doc. 74-11 at 13. Finally, although the self-serving nature of
Jackson's testimony does not, on its own, permit the court to disregard it, *Feliciano
v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2015), the court can
discount a declaration if it is "blatantly contradicted by the record, blatantly
inconsistent, or incredible as a matter of law . . ." *Adams v. City of Ormond Beach*,
514 Fed. App'x 952, 955 (11th Cir. 2013) (citing *Feliciano*, 707 F.3d at 1247,
1253-54). This is precisely the case here with respect to Jackson's statement that
his knee condition substantially limited his ability to run and walk.

problems, it does not suggest that those problems limited any major life function. *See Schwertfager*, 42 F. Supp. 2d at 1357–58. Accordingly, because Jackson has failed to introduce sufficient evidence of a disability, as defined by the ADA, summary judgment is due on his ADA claims.

### B. Jackson Failed to Establish that the City Discriminated Against him Because of his Age or Disability

Alternatively, Jackson's ADA claim fails because of his failure to proffer evidence showing that his purported disability actually motivated the City's decision to discharge him. The ADEA claim fails also for similar reasons. The main thrust of Jackson's disparate treatment claims consists of evidence that the City treated purportedly similarly situated, non-disabled, substantially younger employees charged with "conduct unbecoming a classified employee" more favorably.  Doc. 74 at 23–24. Specifically, Jackson cites the following instances of officer misconduct that did not result in discharge: (1) an officer used social media to brag about using excessive force on a suspect, doc. 90-5, (2) an officer used racially derogatory language to insult another officer, doc. 90-6, (3) an off duty, intoxicated officer wrecked a City vehicle, doc. 90-7, and (4) an officer wrecked a City vehicle and lied about the cause, doc. 90-8. "To establish discrimination in discipline, . . . a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar

misconduct but did not receive similar discipline." *Alexander v. Fulton Cty.*, 207

F.3d 1303, 1336 (11th Cir. 2000). "To be an adequate comparator, the

preferentially treated individual from outside the plaintiff's protected class has to

be similarly situated to the plaintiff in all relevant respects." *Smith v. Lockheed-

Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (citing *Holifield v. Reno*,

115 F.3d 1555, 1562 (11th Cir. 1997)). Critically, "the quantity and quality of the

comparator's misconduct [must be] nearly identical [to Jackson's alleged

misconduct] to prevent courts from second guessing employers' reasonable

decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364,

1368 (11th Cir. 1999); *see also Foster v. Biolife Plasma Serv's, L.P.*, 566 Fed.

App'x 808, 811 (11th Cir. 2014) (requiring comparator to be comparable in "all

relevant aspects," and evidence that comparator engaged in conduct that was

"nearly identical" to the plaintiff's alleged conduct).

Jackson's comparators are not similarly situated because they did not engage

in nearly identical conduct. The City discharged Jackson because it determined

that, while on duty, he sent sexually suggestive text messages to a civilian which

made her uncomfortable, initiated a traffic stop for no apparent reason other than to

talk to this civilian after she declined to meet him at a restaurant, turned off his

MVR equipment during the stop, and then tried to pressure her to "back him up"

about the incident. *See* docs. 61-10; 61-11; 61-12; 61-15; 61-17. Moreover,

although the City also charged each of Jackson's comparators with "conduct

unbecoming a classified employee," unlike Jackson, the comparators were not

charged also with failure to use an MVR device.[5] *Compare* docs. 90-5; 90-6; 90-7;

90-8 *with* docs. 61-11; 61-17. Simply put, because Jackson's alleged misconduct is

materially different from that of his comparators, and because the City charged

them with different combinations of rule violations, Jackson's prima facie case

fails. *See, e.g. Miller-Goodwin v. City of Panama City Beach*, 385 Fed. App'x 966,

973 (11th Cir. 2010) (comparators did not establish causation because "there has

been no showing that any [comparator] violated all of the Rules and Regulations

that resulted in [plaintiff's] termination or that their alleged misconduct was nearly

identical to [plaintiff's]"). Accordingly, because Jackson has not proffered any

other evidence indicating that the City discharged him because of his age or

disabilities, summary judgment is due to be granted on his ADA and ADEA

disparate treatment claims.

--------

[5] Jackson contends that the incident involving excessive force by another officer
also included an MVR rules violation because the offending officer's MVR device
was not recording during the incident. Doc. 74 at 10. However, Sgt. Didcoct
attributed this to a problem with the MVR system–i.e. Sgt. Didcoct explained that
when the incident occurred in 2011, because MVR devices drained the vehicle's
batteries, the camera automatically shut down after forty-five minutes and officers
had to manually log back into the system to re-start the MVR. Doc. 90-2 at 12. He
added that after the excessive-force incident, the HPD re-programmed the software
so that the MVR automatically re-booted after the officer started the patrol vehicle.
*Id.* In other words, unlike Jackson, a problem with the MVR caused the failure to
record rather than an affirmative act by the officer.

### C. The City has Proffered Nondiscriminatory Reasons for Jackson's Discharge and Jackson has Failed to Present Sufficient Evidence that the City's Reasons were Pretext for Disability or Age Discrimination

Even if Jackson can establish a prima facie case of disability and age discrimination,[6] summary judgment is still due because of Jackson's failure to establish that the City's proffered reasons for his discharge were pretext for disability or age discrimination. As justification for the discharge, the City contends that it discharged Jackson for violating two official policies based on the incident involving Chaney. *See* docs. 61-10; 61-11; 61-12; 61-15; 61-17. Because the City's "burden of rebuttal is exceedingly light. . . ," *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)), the burden shifts to Jackson to prove that the City's reasons were pretextual. "To show pretext, [Jackson] must present sufficient evidence 'to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Gerard v. Board of Regents of the State of Ga.*, 324 Fed.

_____

[6] The City contends that, because of his purported disabilities which made him unfit to work as an officer, Jackson cannot establish his prima facie case of age discrimination. Doc. 60 at 30; *see also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (prima facie case for age discrimination requires a showing that plaintiff was qualified to do the job). However, because Jackson is not disabled for ADA purposes, *see supra* at 15–19, the court finds that Jackson was qualified to serve as a police officer for the City. Accordingly, because the City does not offer facts challenging the remaining elements of Jackson's age discrimination claim, the court finds that Jackson has met his prima facie case.

App'x 818, 826 (11th Cir. 2009) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted)). Specifically, Jackson can demonstrate pretext through "weaknesses, implausibilities, inconsistencies, or contradictions" in the City's explanation, *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006), or by introducing evidence that would permit "the jury to reasonably disbelieve the employer's proffered reason." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003). Moreover, Jackson must make this showing through "concrete evidence in the form of specific facts which show that [the City's] proffered reason [was] mere pretext. Mere conclusory allegations and assertions [do] not suffice." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

As evidence of pretext, Jackson maintains that HPD's investigation was "incomplete" because (1) Sgt. "Didcoct failed to interview Jackson or any of the officers with firsthand knowledge of Jackson's relations with Chaney, or the relations of those officers with Chaney . . [,]" doc. 74 at 21, (2) Chaney was apparently "unwilling" to cooperate with the investigation, *id.*, and (3) Chief Roberson and Mayor McBrayer did not review the "complete investigation file[,]" *id.* at 23. These facts, however, are not sufficient to indicate that "*both* the reason [for Jackson's termination] was false, *and* that discrimination was the real reason" for his discharge. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 512 n.3 (1993).

23

For example, while Jackson is correct that Sgt. Didcoct did not interview Jackson, Sgt. Didcoct gave Jackson the opportunity to file a written response. *See* doc. 61-11 at 3. Critically, Jackson does not explain how Sgt. Didcoct's failure to interview other officers who knew Chaney, or had "knowledge of Jackson's relations with Chaney," would have altered the outcome of the investigation especially since the other officers were not witnesses to Jackson's conduct. Apparently, Jackson believes that Sgt. Didcoct would have learned that other officers had a similarly "flirtatious" rapport with Chaney. *See* doc 74-1 at 1. Even so, this fact does not show that Jackson's purported rule violations were not the actual reason for his discharge. Moreover, the fact that Chaney may have mutually "flirted" with other officers does not mean that she welcomed Jackson's conduct or that the other officers engaged in the type of alleged conduct that resulted in Jackson's discharge. After all, Chaney's mutual flirtation with other officers is not an open invitation to Jackson, nor is her relationship with other officers necessarily probative in an investigation of Jackson's concocted traffic stop and the personal text messages that Chaney contends made her "uncomfortable and scared."

Next, with respect to Chaney's purported unwillingness to cooperate with HPD, the court notes that Jackson submitted two declarations from Chaney in which Chaney claims that she told HPD investigators that she did not want Jackson to lose his job, that she stopped returning HPD's calls, felt like HPD was "blowing

the whole thing out of proportion," "regretted filing the complaint," and

"believe[d] the police department [was using her] as a pawn." Doc. 74-3 at 2–5.[7]

These contentions do not establish pretext because an overly aggressive or rigorous

investigation of Jackson's purported conduct, by itself, does not indicate that HPD

possessed a discriminatory motive, especially since Chaney never retracted her

accusations against Jackson, or otherwise indicated that HPD manufactured the

charges against Jackson. *See* doc. 74-3. In fact, Chaney's opinion that HPD

investigators acted aggressively in attempting to obtain a statement from her

actually undermines Jackson's contentions regarding the alleged incompleteness of

the investigation. After all, Jackson cannot reasonably contend that the

investigation was "completely insufficient[,]" while simultaneously implying that

investigators pursued the complaint overly aggressively. Doc. 74 at 23. Moreover,

Chaney's perception that HPD was "blowing the whole thing out of proportion" is

just as likely a result of the serious nature of her complaint, rather than evidence of

HPD's alleged discriminatory animus. Basically, Jackson is asking the court to

give Chaney, whom he tried to pressure from filing a complaint against him, a veto

over HPD's disciplinary determinations. The court declines to do so because, like

---

[7] Curiously, a month after Chaney's first declaration in which she expresses that she regretted filing the complaint, and four months before she filed her second declaration where she indicated that she felt like a "pawn," she executed an affidavit stating that Jackson's conduct made her feel "scared and uncomfortable" and that she "thought [she] needed to tell someone or he would keep doing this." *See* doc. 61-5.

the court, Chaney is not a "super personnel department that . . . [has the right to] second-guess an employer's decisions." *Elrod v. Sears, Roebuck  Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

Finally, Jackson's contention regarding Chief Roberson and Mayor McBrayer's access to the complete investigation file is also unavailing. Jackson's contention is based on Chief Roberson's testimony that "not every piece of information" was presented to him, and that he did not give Mayor McBrayer an investigation file to review.[8] *See* doc. 90-4 at 15–16. However, Jackson does not point to exculpatory evidence from the investigation that would have resulted in a different outcome. Indeed, based on the evidence before this court, there *is no* exculpatory evidence. Specifically, the investigation revealed (1) a series of sexually suggestive text messages, which Jackson concedes could be interpreted by a reasonable person as inappropriate, *see* docs. 61-1 at 15; 61-3 at 2–6, (2) a video recording of the traffic stop indicating that Jackson had no valid basis for the stop, *see* doc. 61-25, (3) evidence that Jackson manually disabled the MVR before he exited his vehicle, *see* doc. 61-11 at 18, (4) an eleven minute phone call that is consistent with Chaney's account that Jackson attempted to have her "back him

---

[8] To the extent that Jackson is attempting to assert a cat's-paw theory of disparate treatment centered on alleged discriminatory animus harbored by Sgt. Didcoct, *see, e.g. Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999), this contention fails in light of Jackson's failure to proffer any evidence that Sgt. Didcoct harbored discriminatory animus against him.

up," *see* docs. 61-3 at 7; 61-8, and (5) numerous records indicating that Jackson's

MVR equipment was fully operational, *see* doc. 61-1 at 64; 61-4; 61-11 at 17.

Moreover, Jackson received an opportunity to respond to the allegations in writing,

doc. 61-11 at 3, and testified at his disciplinary hearing with the assistance of

counsel, docs. 61-10 at 3; 61-11 at 11. Taken together, Jackson has failed to proffer

any evidence of pretext beyond tenuous innuendo. *See Bryant,* 575 F.3d at 1308.

Accordingly, because Jackson has failed to "undermin[e] the legitimacy of [the

City's] proffered reason[,]" *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1346

(11th Cir. 2000), summary judgment is warranted on his ADA and ADEA

discrimination claims.

### D. Jackson Failed to Establish the Necessary Causal Link between his EEOC charge and his discharge for his Retaliation Claim

The City contends that Jackson failed to introduce evidence of a causal link

between the filing of the initial EEOC charge and his discharge.[9] Doc. 60 at 31.

Although it is undisputed that there is close temporal proximity between the filing

of Jackson's EEOC charge and his discharge, Jackson filed his EEOC charge,

however, <u>after</u> Sgt. Didcoct initiated the investigation, and <u>after</u> learning the City

---

[9] To establish a prima facie case of retaliation, Jackson must demonstrate that (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) there is some causal relationship between the conduct and the adverse employment action. *See, e.g. Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).

planned to take action against him. Doc. 32-1 at 2. Moreover, after filing the

charge—and perhaps in an effort to save his job—Jackson apparently then

mentioned his EEOC charge to Chief Roberson and Deputy Chief Copus. Based on

his decision to disclose the charge, Jackson is now contending that a causal link

exists between his charge and his discharge. Basically, Jackson wants the court to

allow him to create causation based on his decision to file a charge after learning

about his pending discipline and his voluntary decision to inform Chief Roberson

about this charge. The court declines to do so because it would result in Jackson

having veto power over HPD's personnel decisions. Such a right would disrupt the

workplace by encouraging employees who suspect they are about to be disciplined

to engage in protected activity and, thereby, stop their employer from carrying out

the contemplated decision. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272

(2001) ("Employers need not suspend previously planned transfers upon

discovering that  a Title VII suit has been filed, and their proceeding along lines

previously contemplated, though not yet definitively determined, is no evidence

whatever of causality."); *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d

87, 95 (2nd Cir. 2001) ("Where timing is the only basis for a claim of retaliation,

and gradual adverse job actions began well before the plaintiff had ever engaged in

any protected activity, an inference of retaliation does not arise."). *Saffold v.*

*Special Counsel, Inc.*, 147 Fed. App'x 949, 950 – 51 (11th Cir. 2005) ("When an

employer makes a tentative decision *before* protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation." (emphasis in original) (citing *Breeden*, 532 U.S. at 268)). Therefore, where, as here, HPD had already initiated the investigation and had given notice to Jackson of the intent to take action against him prior to purportedly learning about Jackson's EEOC charge, the court finds that Jackson has failed to establish the necessary causal link between his protected activity and his discharge. *See Thomas v. Dep't. of Corr. for the State of Ga.*, 377 Fed. App'x 873, 882 (11th Cir. 2010) (no causation established where employer contemplated plaintiff's discharge before plaintiff filed his charge). Alternatively, as explained above, the retaliation claim fails because the City has proffered sufficient evidence of a legitimate, nondiscriminatory justification for Jackson's discharge, and Jackson has failed to proffer evidence that the City's reasons were pretext for unlawful retaliation. *See, e.g. Holifield*, 115 F.3d at 1567; *see also supra* at 22–27. For these reasons, summary judgment is also due on Jackson's retaliation claims.

## IV. CONCLUSION

For these reasons, the City's motion for summary judgment is due to be granted. The court will enter a separate order consistent with this opinion.

**DONE** the 21st day of August, 2015.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE
